**Affirmed and Memorandum Opinion filed February 12, 2013.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-12-00850-CV

---

## IN THE INTEREST OF J.R.W., CHILD

---

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2010-05537J**

---

## MEMORANDUM OPINION

Appellant, a mother whose parental rights to her young son were terminated, challenges the sufficiency of the evidence supporting the trial court's finding that termination of her parental rights was in the child's best interest. The mother also asserts the trial court abused its discretion in its appointment of the child's conservator. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In August 2010, the Department of Family and Protective Services filed a petition in a suit affecting the parent-child relationship, regarding J.R.W., a two-and-a-half-year-old boy who was living with his mother, appellant, at the time the petition was filed. In its petition, the Department cited an immediate danger to the physical health or safety of the child and sought emergency orders for temporary sole managing conservatorship of the child. The Department sought termination of appellant's parental rights,[1] asserting that such termination would be in the child's best interest because appellant allegedly had committed a number of acts or omissions in violation of the Texas Family Code.

As reflected in a sworn affidavit accompanying the petition, a physician made a referral to the Department, alleging that appellant's son had lost some function in his hand because she had failed to bring the child to a doctor at appropriate intervals for treatment of burns on the child's hand. After the petition was filed, the child was placed in the care of the child's paternal grandmother; the Department was appointed temporary managing conservator of the child. Criminal charges relating to appellant's medical neglect of the child were also filed. Appellant answered the suit, generally denying the allegations. The child's paternal grandmother filed a petition in intervention seeking conservatorship.

A family service plan was implemented and signed by appellant on October 5, 2010. Although appellant claimed at trial to have completed all of the requirements of the family service plan, other witnesses testified that she did not

---

[1] The Department also sought to terminate the putative father's parental rights and any unknown father's parental rights in the child's best interests. The record reflects that the child's father voluntarily relinquished his parental rights to the child and the trial court terminated his rights to the child in the same termination decree subject to our appellate review. The father is not a party to this appeal.

complete all of the requirements. Multiple permanency plan and permanency progress reports from February 2011 through April 2012 reflect that appellant completed some but not all of the requirements.

Trial proceedings commenced in January 2012 and recessed until February. At a hearing in February 2012, the parties notified the trial court that they had come to a mediated agreement ("Agreement") that was approved by the Department, a child advocate, and an attorney ad litem. Pursuant to the terms of the mediated Agreement, in relevant part, the child's paternal grandparents were named joint managing conservators and appellant was named possessory conservator who was permitted visitation with the child and also was responsible for child support. The trial court approved the Agreement, finding, based on the recommendation of the guardian ad litem, that the Agreement was in the best interest of the child. One day after the trial court rendered the order on the Agreement, the paternal grandmother moved for reconsideration, noting that the Agreement was a mistake and that the parties could not satisfactorily work together without interference from appellant's family. In her motion for reconsideration, the paternal grandmother asserted that the child's best interest was served by setting aside the Agreement. The record suggests, and it remains undisputed, that appellant's family encouraged her to seek to set aside the final Agreement within twenty-four hours of the Agreement being in effect. At a hearing in open court, the trial court vacated the rendition of the order, and the trial proceedings resumed in May 2012.

According to the trial record, the child came into the Department's care due to appellant's failure to follow up with treatment for the child's hand after he sustained serious burns while in his father's care in July 2009. The child stayed in a hospital for two weeks and underwent two surgeries involving a skin graft to

treat the burn. The child was discharged on August 2, 2009. Although the child needed a follow-up appointment one week after discharge, appellant did not appear for another appointment until more than three months later on November 24, 2009, citing lack of transportation and unstable living arrangements. At that point, the Department had opened an investigation regarding the child's medical treatment based on the doctor's referral.

When the child was discharged from the hospital, he was wearing a splint to keep two of his fingers straight. The child stayed overnight with a relative for two days in October 2009, and the relative misplaced the splint. At the child's medical appointment on November 24, 2009, the child was referred to a specialist, who made a cast for the child to straighten two of the child's fingers. Appellant was instructed to keep the cast on the child's hand and told how to remove it if it got dirty. Appellant admitted that she had removed the cast one time because it had gotten dirty. The record contains a report from a doctor with the University of Texas Physicians Department of Plastic Surgery, who noted during the child's next medical appointment visit on December 2, 2009, that appellant had stated that she removed the cast because she did not think the child needed it.

The record reflects that in May 2010 a surgical procedure was performed on the child's hand. The child was supposed to return for a post-operative examination on June 2, 2010, one week following the procedure. Instead, on that date, appellant made an appointment for June 10, 2010, which she then rescheduled. The child saw the doctor on June 16, 2010, three weeks after the procedure. Appellant claimed that the skin graft had fallen off because the stitches failed and that the child had an open wound. In a report dated June 16, 2010, following that appointment, a doctor noted that the child's parents had removed the

4

dressing and skin graft following the surgery, and that the child had an open wound. The doctor's report, provides in relevant part:

> [I]t is fairly apparent that the parents of this child are not going to do what is recommended for this child as far as routine health care is concerned and therefore I have instructed the parents to keep the wound as clean as possible and let it heal on its own. Eventually when the child is old enough to take care of himself he is going to need some reconstruction of this digit; however, at this point in time it is pointless to try to reconstruct him because his parents will not take care of him.

Appellant testified that although the child could move his fingers after the surgery, his fifth digit had grown more limited and restricted in movement by the time the petition was filed. She had not sought care or treatment of this finger despite her observation. The petition to terminate appellant's parental rights was filed two months later.

Appellant admitted that she did not have stable living arrangements in August 2009, at the time the child was discharged from the hospital. The record reflects that appellant stayed with various relatives and friends for days to months at a time and that she also lived in three different residences of her own between August 2010 and March 2012, when she moved to an apartment on Greens Road. That apartment was a one-bedroom unit furnished with some items for the child, an air mattress for appellant, and a computer in a closet that appellant used for work and school. A Department caseworker observed that the apartment was mostly unfurnished with little to no clothing, food, cleaning supplies, personal or hygiene items, or furniture; the investigator stated that it appeared as if no one lived in the apartment. The caseworker testified that although the family service plan was in effect in October 2010, appellant did not obtain appropriate housing until 2012.

5

Nor did appellant ever produce a copies of lease agreements for two of the apartments she leased.

The record reflects that when the child came into the Department's care, the child had difficulty urinating and suffered from ringworms and extensive tooth decay. Appellant admitted that the child had tooth decay when the child came into the Department's care and that she had been unable to make all the necessary appointments. Appellant also stated that the child had a condition, which is a birth defect referred to as hypospadias, that affected the child's ability to urinate. Based on her understanding of one doctor's explanation, the condition resulted from a botched circumcision and posed "no issues." The record reflects that the child suffered from painful recurrent urinary tract infections, stemming from the untreated condition. Although she confirmed she knew the signs of a urinary tract infection and how to seek treatment for it, she was unfamiliar with any medications the child had been prescribed since he came into the Department's care. The record also reflects that in addition to having ringworms, the child was over one year behind on his immunization schedule when he came into the Department's care at two-and-a-half years of age. According to the record, once the child was placed in the paternal grandmother's care, the child underwent a surgery to successfully correct the urinary condition and received treatment for ringworms and severe tooth decay; he was still being monitored for recurring urinary tract infections. All parties agreed the child, who was age four at the time of trial, was developmentally on target.

Appellant testified that the criminal charges against her, relating to the child's medical neglect, were reduced to a misdemeanor offense of reckless injury to a child, for which she was placed on deferred adjudication for one year. At the time of trial, she remained on deferred adjudication. She also was sentenced to

five days' confinement in a county jail after she pleaded guilty in March 2011 to misdemeanor theft. The record reflects that appellant received negative results on all random drug tests administered pursuant to the family service plan.

Appellant claimed that she visited the child every other week for an hour at the Department's office. She acknowledged that she missed many visits in the beginning of the case due to transportation issues, unstable living arrangements, and not being in a "stable place." During the visits appellant attended, the child was happy to see her. They read books, played, and sang songs together. On several occasions, she brought him clothing or gifts. The record reflects that the child was unhappy and acted out aggressively when appellant, to whom the child referred by a surname, did not attend the visits with the child. The Department caseworker testified that appellant was permitted to visit the child twice each month, but appellant's attendance at these visits was inconsistent. According to the caseworker, appellant visited once in October 2010, and missed all visits in November and December of that year. In 2011, appellant attended seventeen out of twenty-four visits. Appellant missed visits with the child in January and February 2012 and attended only one of the visits in each month of April, May, and June of 2012.

The record reflects that appellant worked at a grocery store for several months in late 2010, and, when that work ended, she babysat relatives' children part-time and received government assistance. At the time of the January 2012 trial proceedings, she had worked part-time at a retail store from October 2011 through April 2012 and continued babysitting. At the May 2012 trial proceedings, appellant claimed to have been working at a financial institution for several weeks, earning $300 each week along with $80 each week in babysitting revenue.

Appellant had not provided the caseworker with any type of verification of employment or proof of income, as required in the family service plan.

Appellant testified she had completed all of the requirements of the family service plan. In therapy, she admitted her role in failing to take the child to medical appointments; the record reflects a therapist's impression that appellant addressed every situation and learned from her mistakes. The record reflects that a therapist had to call appellant with wake-up calls to encourage her attendance at therapy. Appellant was successfully discharged from therapy. Appellant specified her plans for childcare and elementary school if the child were returned to her care. Despite appellant's successful discharge from therapy, the Department caseworker, who read the progress notes from appellant's therapy sessions, placed little emphasis on the "successful discharge," noting that session notes from the last two therapy sessions reflect appellant's belief that she played no role in the child coming into the Department's care.

The caseworker reported that appellant was not honest and did not provide information about her fiancé, who lived with appellant at times and had a criminal background, or about her subsequent pregnancy and the birth and whereabouts of another child, a daughter.[2] Although the Department had opened an investigation regarding the daughter, no petition to terminate appellant's parental rights to the daughter had been filed.

The child's paternal grandmother testified that the child was placed in her home and care, via the Department, in August 2010. In the paternal grandmother's care, the child underwent successful outpatient surgery to correct the urinary

---

[2] The daughter, who remained in the care of a maternal grandmother, is not a child subject to this appeal.

condition. The paternal grandmother attended numerous medical appointments with the child to obtain updated immunizations, get treatments for the ringworms, and address the extensive tooth decay. The grandmother met with the child's doctor to inquire about the child's curved finger, which likely will require multiple surgeries in the future. The paternal grandmother expressed her belief that appellant had engaged in conduct injurious to the physical and emotional welfare of the child through inconsistent visitation, failing to research the child's medical conditions, and failing to attend medical appointments. The paternal grandmother cited appellant's inconsistency in providing stability for the child as the reason appellant's parental rights should be terminated in the child's best interests. The paternal grandmother's long-term goal was to adopt the child, who has bonded well with others in the home, noting that the child's best interest would be met with continued placement in her home.

The Department caseworker testified that at the time the petition was filed, the Department's goal for the child was "relative conservatorship" and "relative adoption," both of which would implicate termination of appellant's parental rights; the Department likely would have changed its goal had appellant provided accurate and verifiable information and demonstrated stability in housing and in providing for the child financially. The caseworker testified that appellant's parental rights should be terminated on best-interest grounds, noting that the child has a need for permanency. The caseworker testified that appellant has not demonstrated an ability to provide a safe, stable home for the child, an ability to independently support him, or any ability to understand and meet the child's medical needs.

Regarding the parties' mediated Agreement, when asked whether the child's best interests would be met by appointing the paternal grandmother as managing

conservator with appellant as a possessory conservator as set out by the parties' mediated Agreement, the caseworker opined that such an arrangement would not provide the child permanency because appellant did not consistently attend her visits with the child. The caseworker believed that the Agreement also proved to be unworkable because appellant's family members created an unsafe and threatening environment for the child by parking outside of the paternal grandmother's home, noting that appellant was not assertive with her family members in explaining how the child's best interest were met through the Agreement and was not putting the child's needs ahead of her own needs. In terms of why the Agreement was no longer a workable option that was in the child's best interests, the paternal grandmother stated that the child and the rest of her family would be placed in a "hostile" environment, noting that appellant's family members made an obscene hand gesture towards her during a break in the trial proceedings.

A child advocate coordinator/ad litem testified that she attempted to visit appellant's homes on six occasions, but was never permitted to enter because appellant was not home. The coordinator noted appellant's lack of stability in housing and employment as a basis for terminating appellant's parental rights, describing appellant as "coming in and out of" the child's life. The coordinator noted that her organization had approved the Agreement, believing it to have met the child's best interests at the time, but that it became immediately apparent that appellant was not able to meet the requirements of the Agreement. The coordinator learned that in the days after the Agreement was signed, appellant's family members were pressuring appellant and interfering with appellant's ability to uphold the Agreement. According to the coordinator, to proceed with the Agreement under such conditions would have been against the child's best

interests. The coordinator also stated that appellant had "no-showed" or cancelled forty-three percent of her visits with the child even during the trial proceedings. The coordinator cited this statistic as the basis of her belief that the Agreement would have been unworkable and not in the child's best interest because, even had the Agreement been in place, appellant's attendance at scheduled visits would have remained inconsistent.

In a written decree for termination, signed August 31, 2012, the trial court terminated appellant's parental rights to the child, finding clear and convincing evidence that termination of the parent-child relationship was in the child's best interest. The court also found by clear and convincing evidence that appellant engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child, pursuant to section 161.001(1)(E) of the Texas Family Code and failed to comply with provisions of a court order that specifically established the actions necessary for appellant to obtain the return of the child pursuant to section 161.001(1)(O) of the Texas Family Code. The trial court found that appointment of a parent as a managing conservator would not be in the child's best interest, and appointed the Department as sole managing conservator, finding the appointment to be in the best interest of the child. Appellant's motion for new trial was denied.

## ANALYSIS

**Is the evidence legally and factually sufficient to support the trial court's finding that termination of the mother's parental rights is in the best interest of the child?**

The Department had to prove by clear and convincing evidence that appellant engaged in conduct specified in sections 161.001(1)(E) or (O) of the

Texas Family Code[3] and that termination of her parental rights was in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Because termination of parental rights is a drastic remedy, due process and the Texas Family Code require the Department to have proved the necessary elements by the heightened burden of proof of "clear and convincing evidence." *See* Tex. Fam. Code Ann. § 161.001 (West 2011); *In re B.L.D.*, 113 S.W.3d 340, 353–54 (Tex. 2003). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of face a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2011). Appellant does not challenge the sufficiency of the evidence to support the trial court's findings authorizing termination under sections 161.001(1)(E) or (O). But, a statutory act or omission under section 161.001(1) must also be coupled with a finding that termination of the parent-child relationship is in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001; *Yonko v. Dep't Fam. & Prot. Servs.*, 196 S.W.3d 236, 242 (Tex. App.—Houston [1st Dist.] 2006, no pet.). In her first issue, appellant challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of the parent-child relationship is in the child's best interest.

In reviewing legal-sufficiency challenges to termination findings, we consider all of the evidence in the light most favorable to the termination findings to determine whether a reasonable factfinder could have formed a firm belief or conviction that these findings are true. *J.L.*, 163 S.W.3d at 85. Considering the evidence in the light most favorable to the findings means we presume the factfinder resolved disputed facts in favor of its findings if a reasonable factfinder

---

[3] Unless otherwise specified, any reference to "section" pertains to the Texas Family Code.

could do so.  *Id.*  We disregard any evidence that a reasonable factfinder could have disbelieved or found to have been incredible.  *Id.*

In reviewing factual-sufficiency challenges to termination findings, we give due consideration to evidence that the factfinder reasonably could have found to be clear and convincing.  *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).  The factual-sufficiency inquiry is whether the evidence is such that the factfinder reasonably could form a firm belief or conviction about the truth of the Department's allegations.  *Id.*  We consider whether the disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding.  *Id.*  "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction about the truth of the petitioners' allegations, then the evidence is factually insufficient."  *Id.*  We give due deference to factual findings, and we do not supplant the factfinder's judgment with our own.  *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

A strong presumption exists that the best interest of the child is served by keeping the child with its natural parent and the burden is on the Department to rebut that presumption.  *See In re S.M.L.*, 171 S.W.3d 472, 480 (Tex. App.—Houston [14th Dist.] 2005, no pet).  Factors for consideration in determining the best interest of a child include the following:  (1) the desires of the child, (2) the present and future physical and emotional needs of the child, (3) the present and future emotional and physical danger to the child, (4) the parental abilities of the persons seeking custody (in promoting the best interest of the child0, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by the individuals or agency seeking custody, (7)

13

the stability of the home or proposed placement, (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate, and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). A finding in support of "best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *Id*. The list of factors is not exhaustive, nor is evidence required on all nine of the factors to support a finding terminating a parent's rights. *Id.* at 372. Appellant points to the *Holley* factors as weighing in favor of preserving the parent-child relationship, asserting that the Department produced scant evidence to rebut the parental presumption.

For cases in which the Department or another government agency is the petitioner, section 263.307(a) provides that "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tex. Fam. Code Ann. § 263.307(a) (West 2008). A trial court may also consider the following statutory factors and any other relevant information in determining the best interest of a child: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department or other agency; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, or other family members or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the

14

perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. *See* Tex. Fam. Code Ann. § 263.307(b) (West 2008); *see also In re J.J.C.*, 302 S.W.3d 436, 447–48 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

We address the evidence pertaining to the various factors all together because it is overlapping and interconnected. The child, at four years old during the trial proceedings, was unable to articulate his desires at trial. The evidence reflects that during his visits with appellant, the child was happy. The evidence suggests that he and appellant bonded some as they played, read books, and sang songs together during their visits. But, the record also reflects that the child referred to appellant by a surname or a nickname derivation of her first name, which suggests that they have not bonded as a parent-child. Appellant admitted that her attendance at the scheduled visitations with the child were inconsistent in the beginning of the case, citing transportation issues as the main reason she could

15

not consistently attend the planned visits. She testified that on some occasions, if she was one minute late to a visit with the child, the visit would be cancelled. She denied missing any visitations in 2012 in the months leading up to trial. The paternal grandmother asserted that appellant had engaged in conduct injurious to the physical and emotional welfare of the child through inconsistent visitation. Other witnesses testified that appellant's attendance at the visitations remained inconsistent even up to and throughout the trial proceedings and that appellant had missed forty-three percent of her visits with the child in a span of nearly two years. The evidence in the record reflects that when appellant missed these visits, the child would act out aggressively toward others, suggesting that the child had bonded with appellant and was unhappy when she missed the visitation. A parent's inconsistent visits may serve as an example of acts or omissions indicating that termination is in the child's best interest. *See In re S.N.*, 287 S.W.3d 183, 193 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

The record evidence reflects that the child was placed in a safe, stable home with the paternal grandparents who have reared ten children; five of those children remained in the home at the time of trial. The evidence reflects that the child had bonded well with others in the home, including an uncle who was just a year or two older than the child. The paternal grandmother hoped to adopt the child. Appellant expressed her plans to place the child in daycare and then to enroll him in one of two elementary schools when he was of age. The record reflects that the child needed permanency in his life and that appellant had "come in and out of" the child's life. The need for permanence is paramount in considering a child's present and future needs. *In re M.C.H.*, No. 14-12-00103-CV, 2012 WL 1795123, at *4 (Tex. App.—Houston [14th Dist.] May 17, 2012, no pet.) (mem. op.). Appellant admitted, and the record reflects, that she had unstable living

16

arrangements for some of the time after the child came into the Department's care in 2010, staying with others or moving to several residences of her own. Appellant asserts on appeal that she has turned her life around and now can provide a stable home for her son. But, the caseworker believed that appellant had not demonstrated that she could obtain stable housing until 2012, at the time the trial proceedings were beginning, even though the family service plan imposed that requirement on October 2010. The record also reflects that, although appellant was employed at the time of trial, she had switched jobs several times or remained unemployed and received government assistance in the same two-year time frame despite the requirement in the family service plan for appellant to obtain and maintain verifiable employment. Repeatedly, the paternal grandmother, the Department caseworker, and the child advocate coordinator cited appellant's instability in maintaining a home and employment as the basis for termination being in the child's best interest. A parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs. *See In re C.A.J.*, 122 S.W.3d 888, 894 (Tex. App.—Fort Worth 2003, no pet.) (concluding evidence was sufficient to support best-interest findings for mother who admitted being unable to care for child, had no stable source of income or permanent home). This evidence weighs in favor of the trial court's best-interest finding. *See id.*

The paternal grandmother testified as to her belief that appellant had engaged in conduct injurious to the physical and emotional welfare of the child through failing to research the child's medical conditions and failing to attend medical appointments. The record reflects that the paternal grandmother ensured the child was treated for his various medical issues and acknowledged that the child will need more surgeries on his hand as he grows older. The paternal grandmother committed to ensuring the child will continue to receive medical care

17

and treatment so that he can fulfill his dreams of holding a football. Appellant acknowledged that the child is clean and well-cared-for in his current placement. Appellant admitted her failure to take the child for medical treatment as the reason the child came into care, citing lack of transportation as one reason for not taking the child to medical appointments. When deciding that termination is in the child's future best interest, the trial court reasonably could have considered that appellant neglected her son's medical treatment during a critical time, which potentially impacts the physical and emotional needs of the child. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (recognizing evidence establishing a statutory ground for termination also may be probative of best-interest issue); *In re B.K.D.*, 131 S.W.3d 10, 17 (Tex. App.—Fort Worth 2003, pet denied) (recognizing that factfinder may infer that past conduct endangering child's well-being may recur in the future if child is returned to the parent). The parties disagreed at trial whether appellant understood and admitted her role in the child coming into the Department's care. Some of the notes from appellant's therapy sessions reflect that she admitted her role in failing to take the child to medical appointments; notes from appellant's last two therapy sessions reflect that she did not accept her role in the child coming into the Department's care. Though the Department caseworker testified that appellant did not demonstrate that she understood or expressed concerns over the child's medical needs, evidence in the record reflects that appellant did ask some questions about the child's medical treatment and conditions. However, even at trial, appellant was unfamiliar with the child's current medications and could not demonstrate any understanding of the child's urinary condition, from which the child's recurring urinary-tract infections still continued. A trier of fact could have inferred that appellant's past medical neglect of the child and apparent apathy regarding the child's prescribed medications would continue, and this evidence

18

supports the best-interest finding. *See In re J.S.G.*, No. 14-08-00754-CV, 2009 WL 1311986, at *9 (Tex. App.—Houston [14th Dist.] May 7, 2009, no pet.) (mem. op.) (providing evidence that a parent who could not produce or locate a child's pharmacy records in a medical-neglect case supported a finding that termination was in the child's best interest).

While appellant acknowledged her failure to keep up with the child's medical appointments, she asserts on appeal that she successfully completed first aid and parenting courses, earned a high-school diploma, became gainfully employed, and obtained her own apartment. The undisputed record evidence reflects that appellant did not fully comply with the requirements set forth in the family service plan. Although appellant successfully completed some of the services, the record reflects that she did not complete the services in the time-frame set out by the family service plan. Appellant testified that the therapist would call her in the mornings with a wake-up call to ensure she made it to her therapy sessions. On this basis, the evidence weighs in favor of the trial court's ruling. *See In re R.D.S.*, No. 14-09-00980-CV, 2010 WL 4882457, at *7 (Tex. App.—Houston [14th Dist.] Nov. 30, 2010, no pet.) (mem. op.) (considering parent's completion of the family service plan in determining best-interest finding). To the extent appellant has made positive strides in her life, a trier of fact is not required to ignore a long history of irresponsible choices and abusive behavior simply because the behavior abates as trial approaches. *See In re J.O.A.*, 283 S.W.3d 336, 343 (Tex. 2009) (providing that significant evidence of improved conduct, especially in short duration, does not conclusively negate the probative value of a history of irresponsible choices); *In re M.G.D.*, 108 S.W.3d 508, 513–14 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (providing that evidence of a recent

turnaround should be determinative only if it is reasonable to conclude that the positive improvements will surely continue).

Appellant points to the Agreement, in which the paternal grandparents were appointed permanent managing conservators and appellant was appointed a possessory conservator, noting that, at one time, it was agreed to be in the child's best interest. Although the record reflects that the parties had agreed that the Agreement was in the best interest of the child, the record also reflects that within twenty-four hours of signing the Agreement, appellant expressed to others that she was being encouraged by her family members to back out of the Agreement. When the paternal grandmother learned from appellant that family members were pressuring appellant to seek to set aside the Agreement, the paternal grandmother testified that the Agreement would have been unworkable, noting hostilities between the families. In particular, as discussed above, the paternal grandmother testified that appellant's family members created an unsafe and threatening environment for the child by parking outside of the paternal grandmother's home, that appellant was not assertive with her family members in explaining how the child's best interest were met through the Agreement and was not putting the child's needs ahead of her own needs, and that a family member made an obscene hand gesture towards the paternal grandmother during a break in the trial proceedings.

On appeal, appellant characterizes the reasons for backing out of the Agreement as being weak and claims that the child would retain the same stability and permanency in the paternal grandmother's home under the arrangements in the

Agreement with appellant as a possessory conservator.[4]  But, the record also reflects one witness's belief that even had the Agreement been in effect, appellant's continued inconsistent visitation with the child would not have been in the child's best interest, rendering the Agreement effectively unworkable and not in the child's best interest.  The caseworker, paternal grandmother, and child advocate coordinator all testified the child needed permanency, stability, and consistency, and the record reflects that appellant expressed concern over the Agreement within twenty-four hours of signing it, suggesting inconsistency in her actions with regard to the child's best interest.  The record also reflects evidence that appellant told others that if the Agreement were final, she planned to file a petition for modification of the Agreement six months later.  Ongoing proceedings would not have provided the child the permanency, stability, and consistency that he needed.  *See In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (noting that the need for permanence is a paramount consideration in determining the child's present and future physical and emotional needs).

Viewing all the evidence in the light most favorable to the judgment, we conclude that a factfinder could have formed a firm belief or conviction that termination of appellant's parental rights was in the child's best interest.  *See* Tex. Fam. Code Ann. § 161.001(2); *J.F.C.*, 96 S.W.3d at 265–66.  Considering the same evidence in a neutral light, we conclude the disputed evidence is not so significant as to prevent a trier of fact from forming a firm belief or conviction that termination of appellant's parental rights was in the child's best interest.  *See* Tex.

---

[4] Although appellant asserts that the Agreement is similar to one that appellant reached with the maternal grandmother regarding conservatorship of appellant's daughter, the record does not contain any such agreement for the daughter or testimony about those specific arrangements.

Fam. Code Ann. § 161.001(2); *In re C.A.J.*, 122 S.W.3d 888, 894 (holding that evidence was factually sufficient to support termination in the child's best interest when evidence reflected that the mother was unable to maintain a stable home or employment). The evidence is legally and factually sufficient to support the trial court's findings that termination of the parent-child relationship is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001; *C.A.J.*, 122 S.W.3d at 894. Therefore, we overrule appellant's first issue.

**Did the trial court abuse its discretion in its appointment of the managing conservator?**

In a second issue, appellant asserts the trial court abused its discretion in appointing the Department as the child's sole managing conservator and in failing to appoint her as a managing or possessory conservator of the child. She challenges several of the trial court's findings of fact and conclusions of law related to the conservatorship. Appellant refers to the strong presumption that the child's best interest is served by keeping the child in the custody of a natural parent. Section 153.131, entitled "Presumption That Parent to be Appointed Managing Conservator," provides:

> (a) Subject to the prohibition in Section 153.004, unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child.

> (b) It is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child. A finding of a history of family violence involving the parents of a child removes the presumption under this subsection.

Tex. Fam. Code. Ann. § 153.131 (West 2008).

22

In cases where a trial court's termination of the parent-child relationship is reversed, a parent is required to independently challenge a trial court's finding under section 153.131(a) to obtain reversal of the conservatorship appointment. *See In re J.A.J.*, 243 S.W.3d 611, 616–17 (Tex. 2007); *In re A.S.*, 261 S.W.3d 76, 92 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). In this case, however, we have overruled appellant's challenge to the termination, and the trial court's appointment of the Department as sole managing conservator may be considered a "consequence of the termination pursuant to Family Code section 161.207." *In re A.S.*, 261 S.W.3d at 92. Section 161.207, entitled "Appointment of Managing Conservator on Termination," provides: "If the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, the Department of Protective and Regulatory Services, a licensed child-placing agency, or an authorized agency as a managing conservator of the child." Tex. Family Code Ann. § 161.207(a) (West 2008). Appellant provides no authority for the proposition that she is a "suitable, competent adult" as contemplated by section 161.207(a) or that the presumption in section 153.131(a) applies to a parent whose parental rights have been terminated under Chapter 161. *See In re A.W.B.*, No. 14-11-00926-CV, 2012 WL 1048640, at *7 (Tex. App.—Houston [14th Dist.] Mar. 27, 2012, no pet.) (mem. op.). Rather, when a trial court terminates the parent-child relationship, the court also "divests the parent and the child of all legal rights and duties with respect to each other." Tex. Fam. Code Ann. § 161.206 (West 2008); *A.W.B.*, 2012 WL 1048640, at *7. Accordingly, appellant's challenge to the trial court's appointment of the Department as sole managing conservator, rather than appellant, is without merit. We overrule appellant's second issue.

The trial court's judgment is affirmed.


/s/    Kem Thompson Frost
       Justice


Panel consists of Justices Frost, Brown, and Busby.